EX PARTE W. H. GRAY.

No. 1442.  Decided December 6, 1911.

Rehearing denied February 28, 1912.

**1.—Contempt—Witness—Legislation—Constitutional Law—Committee.**

The appointment of a special committee by the Senate of Texas, at a special session of the Legislature, to gather information and make recommendations in regard to amending, enacting or repealing laws is not legislation as contemplated under section 40, article 3 of the Constitution; nor is the appointment of such committee by either branch of the Legislature, without concurring action of both Houses contrary to section 37, article 3 of said instrument. Davidson, Presiding Judge, dissenting.

**2.—Same—Authority of Committee—Pertinency of Questions—Presumption.**

A committee appointed by the Senate, during a special session of the Legislature, to gather information and make recommendations in regard to enacting or repealing laws, has authority as broad as the Senate cared to make it, to ask relator such questions and demand his answers thereto, as long as the information sought was on subjects upon which it had a right to

legislate, inquire into or act; and at least some of the questions propounded were pertinent to the matters about which it had a right to inquire; and it must be presumed that the Governor would submit for legislation the matters in regard to which he was petitioned by the Legislature, and that if he did not do so that he did not consider the information sufficient. Davidson, Presiding Judge, dissenting.

### 3.—Same—Good Faith of Committee can not be Assailed.

When the Senate, during a special session of the Legislature, by simple resolution, appointed a committee to gather information and inquire into the general election law, as well as an election held recently prior to its meeting on Statewide prohibition, its good faith in doing so can not be assailed.

### 4.—Same—Power to Punish · for Contempt—Obstructing Legislative Proceedings—Inherent Judicial Power—English Parliament—Legislation Suggested.

Neither the Legislature of Texas, nor either of its branches, has the inherent power under the Constitution to punish a person by imprisonment for contempt; this is a judicial power and is alone contained in section 15, article 3 of the Constitution of Texas, and the Legislature of Texas is not clothed with the judicial power possessed by the English Parliament; and while the Legislature under the above article can punish. for contempt for disrespectful and disorderly conduct in its presence or for the obstruction of its proceedings, this does not embrace any matter that may take place. before a committee of either House to conduct investigation, etc., as the proceedings of either House are not required to be published in the Legislative Journals, and are no part of the proceedings of the Legislature, and therefore, relator could not be punished for contempt for refusing to answer questions propounded by such committee. See suggestion in the opinion that the Legislature could pass laws making such refusal a penal offense to be tried by the courts. Davidson, Presiding Judge, concurring in result, but not in opinion. Prendergast, Judge, dissenting.

### 5.—Same—Constitutional Law—Senate Committee—Legislative Proceedings—Case Stated.

Where relator was adjudged guilty of contempt by the Senate of Texas for refusing to answer questions before a special committee appointed by said Senate during a special session of the Legislature to investigate election frauds and the election law, and it appeared that said proceedings before said committee were not required to be published in the Senate Journal, and were not a part of the legislative proceedings contemplated under section 15, article 3 of the Constitution of Texas, and the facts did not bring relator within the provisions of this constitutional clause, said Senate had no power or authority to punish relator for contempt for obstructing the proceedings of the Legislature by refusing to answer questions before such committee, and he must be discharged. Davidson, Presiding Judge, concurring in result, but not in opinion. Prendergast, Judge, dissenting.

### 6.—Same—Criminal Contempt Not a Criminal Case—Motion for Rehearing—Practice on Appeal.

Criminal contempt is not a crime, not having been made so by the Penal Code; but if it was, the Court of Criminal Appeals, being a Court of Review, has the right to entertain a motion for rehearing, where relator was discharged by said court on original habeas corpus proceedings. Davidson, Presiding Judge, dissenting.

### 7.—Same—Motion for Rehearing—Rules of Court—Jurisdiction—Practice on Appeal—Habeas Corpus.

Where relator was adjudged guilty of contempt by the Senate of Texas, by resolution of that body, and sued out a writ of habeas corpus before the Court of Criminal Appeals. which court discharged him after hearing the facts in the case, the said court, as a Court of Review, had the right to

entertain a motion for rehearing by the respondent, as said court has juris-
diction, under the rules laid down for its guidance by the Supreme Court, over
its judgments until the end of the term, etc. Davidson, Presiding Judge,
dissenting, but concurring in overruling motion for rehearing. Prendergast,
Judge, concurring to entertain motion, but dissenting from overruling same.

From Travis County.

Original habeas corpus proceeding, asking release from commitment
by the Senate of Texas, punishing relator for refusing to answer
questions before a special Senate committee during a called session
of the Legislature, and inflicting twenty-four hours confinement in
the county jail.

The opinion states the case.

*Jonathan Lane, R. H. Ward, W. A. Hanger, J. L. Storey, H. M.
Garwood, Nelson Phillips, R. S. Neblett* and *J. B. Stubbs,* for relator.
—Authorities cited in companion case of Ex parte J. F. Wolters, this
day decided.

*D. W. Odell, Cullen F. Thomas, Luther Nickels* and *C. M. Cureton,*
for respondent.—Cases cited in companion case of Ex parte J. F. Wol-
ters, this day decided.

HARPER, JUDGE.—By proclamation duly issued the Governor of
this State convened the Legislature in special session for certain
purposes named in the proclamation. Thereafter, during the session,
he called their attention to a number of other matters, and requested
or authorized legislation thereon, but neither in the original procla-
mation nor in any subsequent message to the Legislature did he au-
thorize the passage of a law regulating elections in this State. We
do not deem it necessary in the disposition of this case to name the
subjects on which he did request or authorize legislation, but simply
to state that no amendment of the election laws was authorized by
him in any of his messages, for in this case, under the facts, it is
only necessary for us to determine the authority and power of the
Legislature, in the absence of express authority from the Governor,
to provide for the gathering of information in regard to the mode
and conduct of elections in the past, that such information might
form the basis for recommendation for future legislation.

On the fourth day of the special session the following simple reso-
lution was introduced and adopted by the Senate:

"Whereas, The preservation of free government and of the right of
the people to control their governmental affairs depends upon main-
taining and safeguarding the purity and freedom and honesty of the
ballot and the uncorrupted independence of the voters—in short, upon
a patriotic and uncorrupted ballot properly safeguarded so as to secure
it against any improper influence and to insure that it will be counted
as cast by the voter, and

"Whereas, The laws of this State regulating elections have been recently enacted and changed many times during recent years, and are in need of revision and amendment, as has been generally admitted by many eminent citizens familiar with such laws and their operation, and

"Whereas, The conduct of elections in recent years, particularly that held on the 22d of July, 1911, will, if investigated, place this and future Legislatures of Texas in possession of information which will be very valuable for the purpose of promoting the formulation and passage of such laws as will properly safeguard the purity, freedom and honesty of the ballot and insure that it will be counted as cast and returns of elections made in accordance with the ballots as cast, and

"Whereas, It is charged and believed by a great number of citizens, and has been published in many newspapers throughout the State that large sums of money were used to influence the result of the election held on July 22, 1911, and the manner in which money was used in opposing the adoption of such amendment and the large amount alleged to have been used, has been challenged and criticised as having been improper, unlawful and against sound public policy; which charges, if true, demand further legislation that will prohibit the corruption of the ballot, and

"Whereas, It has been charged by many persons of good standing that those engaged in operating breweries or interested therein, and those engaged in the business of selling intoxicating liquors have for many years maintained an organization of some kind for the purpose of collecting funds for improper use in elections in this State and in various counties and precincts in the State and for improper use in influencing legislation in this State, and

"Whereas, It has been frequently charged that funds collected from brewery owners and from liquor dealers have been used in promoting the candidacy of various candidates for office in this State, and

"Whereas, It has been charged by many persons of good standing that various public officers of this State are upon the payroll of such alleged organizations, and these charges, if true, demand legislation to secure disinterested public service upon the part of all public officials, and

"Whereas, It has been charged by the Executive Committee of such State-wide Prohibition Amendment Association, through a report made by a subcommittee of such executive committee, which said report was signed by the following named citizens of Texas, as members of said subcommittee: Thomas H. Ball, B. F. Looney, Thomas B. Love, W. J. McDonald, Cullen F. Thomas, D. E. Garrett, R. Harper Kirby, W. T. Bartholomew, T. C. Harriss, William E. Hawkins, B. H. Powell, J. S. Crumpton and Richard Mays, that in the recent election held in this State on July 22, 1911, many fraudulent and illegal ballots were cast, and other methods of fraud and evasion

of the election laws resorted to at said election, and other charges made concerning the purity of the ballot box, and

"Whereas, Said parties charge that they have gone far enough into an investigation of such election to convince them to a moral certainty that the result of the election of July 22, 1911, does not represent the verdict of a majority of the qualified voters of the State lawfully entitled to participate in the election, and

"Whereas, Such committee charges that evidence has been submitted to them which convincingly shows that at the very inception of the contest over the State-wide prohibition amendment and in preparation therefor, that the liquor interests entered into a widespread conspiracy to control the election by the use of very large numbers of poll tax receipts illegally issued and that where sworn officers of the State, such as tax collectors, could be reached, poll tax receipts were procured directly from their offices and mailed to voters who had never applied for them or made the necessary affidavits, although the receipts issued therefor showed upon their face that all the requisites of the law had been complied with, and

"Whereas, It is further charged by said committee that in a number of counties it was the practice to have deputies, in some instances negroes, to go out and solicit the payment of poll taxes, their services being paid for by the liquor interests, which also paid for the poll tax receipts, and

"Whereas, Said committee make many other charges which have been published in the daily press of this State, which, if true, render it necessary and proper that this investigation provided for in this resolution should be had to the end that further safeguards may be provided to secure the honesty and fairness of elections and the making of true returns thereof, and

"Whereas, It becomes of vital importance to this or any subsequent Legislature, which may legislate for the purpose, of carrying out section 4 of article VI of the Constitution, that the methods used to evade and violate the laws and destroy the purity of the ballot box shall be known in order that adequate laws preserving the purity of the ballot may be enacted by this or a subsequent Legislature, and the evidence of the violations and evasions of the laws preserved for the assistance of this or any subsequent Legislature which desires to legislate to protect the purity of the ballot box, and

"Whereas, Unless an investigation be now made, much evidence useful to future Legislatures will become inaccessible, therefore be it

"Resolved by the Senate of Texas, That a committee of five (5) be elected by the Senate to conduct such investigation as may be lawful and proper for it to conduct to ascertain and report to the Senate upon the aforesaid matters and the following matters:

"1. The amount of money used by any association of persons or person representing such in promoting and favoring, and the amount of money used by any organization or association of persons, or rep-

resentative of such in opposing the prohibition amendment to the Constitution, voted upon on July 22, 1911, how such money was used, by whom used, from whom collected, or by whom contributed, for what purpose paid out, to whom paid out, including all matters in connection with such use and such expenditure of such money. 2. The fraudulent issuance of poll tax receipts, if any, and unlawful payment thereof, or use thereof, and the evasions, if any, of the provisions of the election law to prevent illegal and corrupt voting. 3. Any frauds committed in procuring naturalization papers, or filing declarations of intention of becoming a citizen. 4. Any illegal voting in such election and any fraud committed, and the failure, if any, of any of the officers of such election or any officers of any county to comply with the election laws. 5. What legislation, if any, is advisable to further safeguard elections against corruption, fraud and improper influences. 6. Whether or not there exists in this State an organization or association of any kind furnishing or expending money to improperly influence elections or legislation in this State, and the methods pursued by such organization, if any, in the conduct of its operation, and the amount of money that is being collected by such organization, the purpose for which it is being collected and how it is being expended, and whether or not the same is being expended in such manner as to contravene sound public policy, and what legislation, if any, may be necessary to remedy the evil. 7. To report generally upon such legislation as may be necessary to correct any or all of the evils, if any, in relation to these matters about which this investigation is directed.

"In addition to the powers and authority conferred upon the committee hereby created, the said committee shall have all the power and authority granted to such committee by chapter 7 of the General Laws of the State of Texas passed at the Thirtieth Legislature at its regular session and approved February 18, 1907, to be found on pages 6, 7, 8, 9 and 10 of such laws, and in addition to such powers the said committee hereby created and any member thereof and any subcommittee appointed by such committee shall have all such powers and authority conferred by the Act aforesaid and full power and authority to hear testimony, to swear witness, to administer oaths, to send for books, papers, letters, telegrams and documents, and to compel the production of such matters and things before said committee or subcommittee or any member thereof, as such committee or subcommittee or member may deem necessary to the proper carrying out of the purposes of this investigation. And in addition to the means authorized by the Act aforesaid, the said committee or any member thereof or subcommittee may report any refusal to obey process or any disobedience of process or any evasion of process to the Senate, and have any person guilty thereof or charged of being guilty thereof brought before the bar of the Senate to be dealt with as the Senate may direct.

"The expenses of the said committee and of any subcommittee and members thereof in conducting the investigation hereby directed and in procuring the attendance of witnesses and paying therefor and the service of process and the paying therefor, and all other expenses necessarily incurred in conducting the investigation shall be paid out of the contingent expense fund of the Senate upon the warrant of the chairman of said committee authorized by the committee itself.

"The said committee shall be known as the Senate Investigating Committee, and such committee shall elect its own chairman and such other officers as it may desire, and establish and make such rules for governing its own procedure and forms of process as may be permitted by law.

"Such committee shall cause the testimony of all witnesses to be taken by a competent stenographer, questions and answers, and shall make a report to the Senate at this session of the Legislature, and shall accompany such report by the evidence taken by it and its recommendation for such changes in the present election laws and for the enactment of such new laws as the evidence adduced may demand for the preservation to the people of their constitutional right to the purity of the ballot."

On the same day the Senate adopted a resolution petitioning the Governor to submit certain subjects for legislation, to wit: "(1) The amendment of the election laws of this State so as to provide against illegal payment of poll taxes, and to reenact such further laws as may be necessary to safeguard the ballot box and secure fair and honest elections without a taint of irregularity, fraud or bribery. (2) The prohibition of brewers, brewery owners, stockholders therein, saloons, saloon owners, and all others connected directly or indirectly with the liquor traffic in this State, from contributing to campaign funds to ' influence elections, and the prohibiting of persons within this State from receiving, using, or disbursing such funds as might be so contributed by the liquor traffic, etc. (3) The enactment of suitable legislation requiring all persons engaged in the sale of intoxicating liquors to close their places of business from 7 o'clock p. m. until 6 o'clock a. m., and to keep same closed during those hours, and providing penalties, etc. (4) The prohibition of the sale of liquor within this State except in unbroken packages and quantities not less than one quart, and prohibiting same from being drunk on the premises where sold, with penalties, etc. (5) The prohibition of the sale of intoxicating liquors within ten miles of any State educational institutions, including the State University, that are supported in whole or in part by appropriation from the State's general revenue, and for penalties," etc.

A committee consisting of Senators Vaughan, McNealus, Warren, Carter and Terrell, of McLennan, was selected by the Senate as the committee authorized by the above resolution, and after organizing they summoned before them relator W. H. Gray, who refused to

answer a number of questions propounded by the committee or under its authority. The relator answered all questions propounded in regard to violations of then existing laws, but declined to answer who, if anyone, was in the employ of the anti-prohibition organization, what salary, if any, was paid to such persons; from what source contributions were received, except that none were received from corporations so far as he knew. He declined to answer whether or not he personally was connected with the anti-prohibition organization in the recent campaign; whether he secured the services of anyone to oppose the amendment, and what, if anything, was paid to such persons, virtually declining to answer any and all questions in regard to the funds received, by whom contributed, the mode and manner of its expenditure, the salary, if any, paid to anyone, and questions in regard to the conduct of the recent election.

The committee reported to the Senate the refusal of the witness to answer the questions, embodying in its report the questions propounded, and the fact that the witness had declined to answer, with the following recommendation:

"Whereas, It appearing to the Senate of the State of Texas, that the said refusal of said witness to answer said question as aforesaid was wilful, and that the same is an obstruction to the lawful proceedings both of the said committee and of the Senate; therefore be it

"Resolved by the Senate of the State of Texas:

"First. That said W. H. Gray be, and is hereby held and adjudged to be guilty of contempt of this Senate and of obstructing the lawful proceedings of a lawful committee of this Senate.

"Second. That the said W. H. Gray be cited to appear before the bar of this Senate at 3 o'clock on the 24th day of August, A. D. 1911, then and there to show cause, if any he has, why the aforesaid adjudication of contempt against him should not be held and adjudged in contempt of this Senate and punished therefor, as required by law."

After a hearing of the cause by the Senate the following resolution was adopted adjudging relator guilty of contempt and assessing his punishment:

"Therefore be it resolved by the Senate of the State of Texas, now in session in the city of Austin, Travis County, Texas, That W. H. Gray be, and he is hereby, held and adjudged to be in contempt of this Senate, and his punishment therefor is assessed at imprisonment and confinement in the county jail of Travis County, Texas, for the period of twenty-four (24) hours, and the assistant sergeant-at-arms of this Senate is hereby ordered and directed to take the body of the said W. H. Gray, and commit it to the jail of Travis County, Texas, for the period of twenty-four hours, unless the said W. H. Gray shall sooner purge himself of said contempt and testify before said committee in aswer to the questions propounded by it or under its direction, and which he has failed and refused to answer, the said questions

being pertinent to the matters authorized by the resolutions hereinbefore set out, and the jailer of Travis County, Texas, is hereby ordered and directed to receive the body of the said W. H. Gray into the jail of Travis County, Texas, for the purpose of the imprisonment and confinement herein imposed; and a copy of this resolution and order shall be a sufficient authority for the commitment and the imprisonment of the said W. H. Gray.".

When arrested under a commitment issued by the Lieutenant-Governor by virtue of said resolution, relator sued out a writ of habeas corpus, which was granted by a member of this court, and after consultation with all members of the court, the cause was set down for hearing at the next regular term of this court. The sergeant-at-arms of the Senate filed with the court the resolution adopted by the Senate, and the writ of commitment issued by the Lieutenant-Governor as authority for his action in the premises. Relator appeared and filed the following answer:

"For answer to the return of the respondent filed herein, and showing that he arrested and holds relator by authority of a writ of commitment, issued on the 26th day of August, 1911, by A. B. Davidson, president of the Senate of the Thirty-Second Legislature of said State, and attested by the secretary of said Senate, commanding the arrest and confinement of relator:

"Relator avers that the issuance of said commitment was illegal, and that the same is now and has been at all times void and violative of the Constitution of the United States of America, of the Constitution of the State of Texas, and of the laws of this State for the following reasons, among others, to wit:

"First: Because the Senate had no lawful authority to create and appoint the committee before which he, on their demand, refused to answer certain questions, and to deliver certain properties, by them propounded to and required of him; and had no lawful authority to pass the resolution under which said committee was acting; and had no authority in law to confer upon said committee the powers, nor any of the powers attempted to be conferred by the resolution providing for and raising said committee; and no authority to pass said resolution in manner and form and substance as it was passed.

"Second: Because said committee had no lawful authority to ask or to require relator to answer any of the questions which he refused. to answer, nor to require him to deliver any of the property which he refused to deliver.

"Third: Because said Senate had no lawful authority to pass the resolution adjudging him guilty of contempt and assessing a punishment against him of confinement in the county jail of Travis County; as he had committed no act or offense of which said Senate had jurisdiction.

"Fourth: Your relator avers that the investigation authorized by the resolution passed by said Senate on August 3, 1911, requiring

the appointment of said committee, was not offered, introduced, nor passed for any legitimate or lawful purpose, or within the line of the duty or privileges of said Senate; but that same was passed solely for political purposes of the Prohibitionists of the State of Texas, and in order that they might gain or endeavor to gain an unlawful and unwarranted advantage over the anti-prohibitionists of this State; that same was not passed, nor was any investigation made, or intended to be made, to gather information in good faith for legislative purposes, nor to aid or assist in any legislation pending or contemplated by said Senate, or the Legislature of which said Senate formed a part, nor to assist or aid in the performance of any duty or lawful act of said Senate, nor were any of the questions asked, to which answers were refused, pertinent or relevant to any legislative proceedings pending or contemplated by said Senate.

"Fifth: Your relator avers that said resolution and the acts of said committee raised thereby, and the acts and resolutions of the Senate ·done thereunder are in violation of the following provisions of the Constitution of the United States of America and of the Constitution of the State of Texas, respectively:

"(a) The attempted punishment, and the manner and form in which it is attempted, of the relator by said Senate, violates that part of the Fifth Amendment of the Constitution of the United States, which provides: 'No person shall . . . be deprived of life, liberty or property without due process of law, nor shall private · property be taken for public use without just compensation.' And also violates the Fourth Amendment of said Constitution, which reads as follows: 'The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures shall not be violated, and no warrants shall issue but upon probable cause supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized.'

"(b) The passage of the resolution, the action of the committee thereunder and the attempt to punish this relator in the manner and form in which it has been done, is in violation of the following provisions of the Constitution of the State of Texas: Section 9, article 1: 'The people shall be secure in their persons, houses, papers and possessions from all unreasonable seizures and searches, and no warrant to search any place or to seize any person or thing shall issue without describing them as near as may be, nor without probable cause supported by oath or affirmation.'

"Section 19, article 1: 'No citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised except by the due course of the law of the land.'

"Section 29, article 1: 'To guard against transgressions of the high powers herein delegated, we declare that everything in this bill of rights is excepted out of the general powers of government, and

shall forever remain inviolate, and all laws contrary thereto or to the following provisions shall be void.'

"Section 1, article 2: ' 'The powers of the government of the State of Texas shall be divided into three distinct departments, each of which shall be confined to a separate body of magistracy, to wit: Those which are legislative to one, those which are executive to another, and those which are judicial to another, and no person or collection of persons being of one of these departments shall exercise any power properly attached to either of the others except in the instances herein expressly provided.'

"Section 1, article 3: 'The legislative power of this State shall be vested in a Senate and House of Representatives, which, together, shall be styled—"The Legislature of the State of Texas." '

"Section 11, article 3: 'Each House may determine the rules of its own proceedings, punish members for disorderly conduct, and with the consent of two-thirds, expel a member, but not a second time for the same offense.'

"Section 15, article 3: 'Each House may punish by imprisonment during its sessions any person not a member for disorderly or disrespectful conduct in its presence, or for obstructing any of its proceedings, provided, such imprisonment shall not, at any one time, exceed forty-eight hours.'

"Section 32, article 3: 'No bill shall have the force of a law until it has been read on three several days in each House. . . .'

"Section 40, article 3: 'When the Legislature shall be convened in special session, there shall be no legislation upon subjects other than those designated in the proclamation of the Governor calling such session, or presented to them by the Governor; and no such session shall be of longer duration than thirty days.'

"Section 37, article 3: 'No bill shall be considered unless it has been first referred to a committee and reported thereon, and no bill shall be passed which has not been presented and referred to and reported from a committee at least three days before the final adjournment of the Legislature.'

"Section 44, article 3: 'The Legislature shall provide by law for the compensation of all officers, servants, agents and public contractors, not provided for in this Constitution . . .. but shall not grant, by appropriation, or otherwise, any amount of money out of the treasury of the State to any individual on a claim, real or pretended, when same shall not have been provided for by preexisting law, nor employ anyone in the name of the State unless authorized by the preexisting law.'

"Section 1, article 5: 'The judicial power of this State shall be vested in one supreme court, in courts of civil appeals, in a criminal court of appeals, in district courts, in county courts, in commissioners

courts, and in courts of the justice of the peace, and in such other courts as may be provided by law.' "

Counsel for relator and respondent appeared and. made able oral arguments on the questions presented, and have filed briefs manifesting great research and thought, and on account of the importance of the questions involved, we have devoted much time to a careful study of the briefs, the authorities cited, and the questions involved.

Under the first paragraph of relator's answer, it is insisted that one branch of the Legislature (the Senate) had no authority to appoint a committee and authorize it to conduct an investigation for the purpose of obtaining information and making recommendations; that if such power existed, it existed in the Legislature as a whole, and it would take the concurrent action of both Houses, together with the approval of the Governor, to give life and validity to an investigating committee; (2) that if the Senate had such power in a general session, it did not have it at a special session; that at the special session it was limited in all its actions to such matters as were submitted by the Governor.

Section 40, article 3, provides that there shall be no *legislation* upon subjects other than those designated by the Governor in his proclamation. If the powers granted the committee come within the meaning of the word *"legislation,"* then it was prohibited at a special session and would also be in violation of article 3 of section 1, which vests the legislative power in the Senate and House of Representatives jointly. The legal definition of the word *"legislation"* in Bouvier's Law Dictionary is "The act of giving or enacting laws—the authority conferred by or exercised under the Constitution of a State or of the United States to make new laws or to alter or repeal existing ones."

In Words & Phrases, vol. 5, page 4086, it is said: "Wharton in his lexicon defines 'legislation' as follows: The act of giving or enacting laws—the power to make laws."

The definition of Bouvier is adopted in the Am. & Eng. Ency. of Law, vol. 2, page 822 (2d ed.), and adds to it: "To legislate is to give, pass or enact law or laws," citing authorities under notes 1, 2 and 3.

In 25 Cyc., 180, it is said the word "legislate" means. to make laws, citing Abbott's Law Dictionary, and the definition of the word "legislation" is given as the "act of giving or enactment of laws," citing authorities to be found on that page.

In the dictionaries the word is defined: "Legislate—To make or enact a law or laws: legislation—Act of legislature; act of making or passing a law or laws; the enactment of laws; laws or statute enacted."

We do not think that the appointment of a committee to gather information and make recommendations in regard to amending, enacting or repealing laws is "legislation" within the meaning of the

word as used in our Constitution. However, it is insisted that if the committee could be appointed at a special session, it took the joint action of both .Houses to create it. Section 37, article 3, of the Constitution, provides that "No bill shall be considered unless it has first been referred to a committee," etc. Does this mean a committee appointed by authority of both Houses, or a committee appointed by either House? Since the organization of our government, each branch of the Legislature has assumed authority to appoint its own committees, without the concurring action of the other branch, and our Supreme Court in the case of The Day Land & Cattle Company v. State, 68 Texas, 544, holds:

"The answer of the defendant alleged that the Act of February 25, 1879, was never legally passed, in that the bill was not referred to a committee of each House before it was acted upon. The answer shows that the bill was referred to a committee by the Senate, who reported upon it favorably before the Senate acted upon it, but that it was not referred to a committee by the House of Representatives before that body acted upon it.

"The Constitution provides that 'no bill shall be considered unless it has been first referred to a committee and reported thereon.' (Const., article 3, section 7.) This does not in terms require a bill to be referred to a committee by each House before it can become a law. The requirement is, that a bill shall be 'referred to a committee and reported thereon' before it shall be considered; this, from the averments of the answer, was done, and we can not, under the wording of the Constitution, say that more than this was necessary."

Thus it is seen that when a bill is referred to a committee created by the Senate alone, it has been held a sufficient compliance with section 37 of article 3, thus recognizing the right of each branch of the Legislature to appoint its own committees, and article 11, of section 3, specifically provides that "each House may determine the rules of its own proceedings," and if the Senate in the exercise of its discretion deemed it essential to appoint a committee to gather information and report back recommendations in regard to the enactment of laws, we think it had the power and authority. This has been the construction of our Constitution by all of our Legislatures in the past, the construction that the Congress of the United States has given to the power possessed by each branch thereof, and the construction of the powers of each branch of the Legislature in almost every State of the Union, in the absence of constitutional inhibition, and we hold that the Senate had the authority and power to create the committee and authorize it to gather information and make recommendations on all subjects, upon which the Legislature would have the right to enact laws.

The second contention is that the questions asked relator sought information which the committee had no right to demand of him. The authority of the committee would be as broad as the Senate

cared to make it, so long as it only sought information upon subjects which it had a right to legislate upon, or to inquire into, and if the information could serve any useful purpose in enabling it to arrive at conclusions upon which to base recommendations for the passage of laws, or the amendment of laws, or the repeal of laws, or the performance of any other of its authorized functions, it would have the right to propound the interrogatories and gather the information. The information demanded must be such as would throw light upon subjects upon which the Legislature would have the right to enact laws or act upon. If this investigation went beyond that scope, relator would not be compelled to answer. And while not taking up each question asked, we think some of them were of a nature that would furnish information to the Legislature on questions which they in their legislative capacity would be authorized to regulate, and inasmuch as failure to answer one question within the scope of the power conferred on the committee would render relator subject to the power of the Senate to be punished for contempt, if it possesses the power to punish in this character of case, we do not deem it necessary to take up each question and discuss whether or not it came within the scope of the resolution passed, but will content ourselves with laying down the general rule that the authority of such committee to propound interrogatories and gather information would be as broad as the language of the resolution authorized, so long as it related to matters upon which the Legislature would be empowered to prohibit, regulate or control, or had a right to inquire into to enable it to properly perform its duty in matters upon which they would be authorized to act. We must presume that the Legislature in petitioning the Governor to submit to it certain subjects for legislation, including the amendment of the election laws, acted in good faith, and believed the Governor would do so if the investigation developed the necessity therefor. And we must also presume that the Governor would have done so, if the information given him either from the investigation or any other source, had convinced him there was urgent need of such legislation. That he did not comply with the petition sent him, we must again presume that in the opinion of the Governor that there was no such urgent demand or need for such legislation as to authorize him to keep the Legislature together in extraordinary session. Congress has passed an Act making it punishable as a misdemeanor to fail to answer proper questions, and in the case of Re Chapman, 166 U. S., 661, it is held:

"It is insisted that the Supreme Court of the District of Columbia, sitting as a Criminal Court, had no jurisdiction; that the questions were not authorized under the Constitution; and that the Act of Congress under which petitioner was indicted and tried is unconstitutional.

"Laying section 103 out of view, we are of opinion that sections 102 and 104 were intended, in the language of the title of the original

Act of January 24, 1857, 'more effectually to enforce the attendance of witnesses, on the summons of either House of Congress, and to compel them to discover testimony.' To secure this result it was provided that when a person summoned as a witness by either House to give testimony or produce papers, upon any matter under inquiry before either House, or any committee of either House, wilfully fails to appear, or appearing, refuses to answer 'any question pertinent to the question under inquiry,' he shall be deemed guilty of a misdemeanor and punished accordingly. And it was also provided that when, under such circumstances, the facts are reported to either House, the President of the Senate or the Speaker of the House, as the case may be, shall certify the fact under the seal of the Senate or House to the district attorney for the District of Columbia, that the matter may be brought before the grand jury for their action.

"It is true that the reference is to 'any' matter under inquiry, and so on, and it is suggested that this is fatally defective because too broad and unlimited in its extent; but nothing is better settled than that statutes should receive a sensible construction, such as will effectuate the legislative intention, and, if possible, so as to avoid an unjust or an absurd conclusion (Lau Ow Bew v. United States, 144 U. S., 47, 58 (36:340, 345), and we think that the word 'any' as used in these sections refers to matters within the jurisdiction of the two Houses of Congress, before them for consideration and proper for their action; to questions pertinent thereto; and to facts or papers bearing thereon. When the facts are reported to the particular House, the question or questions may undoubtedly be withdrawn or modified, or the presiding officer directed not to certify; but if such a contingency occurs, or if no report is made or certificate issued, that would be matter of defense, and the facts of report and certificate need not be set out in an indictment under the statute. In this case we must assume that there was such report and certificate, and indeed we do not understand this to be controverted, as it could not well be in view of the Senate proceedings as disclosed by its journal and otherwise. Senate Journal, 53d Cong., 2d Sess., p. 238; Senate Rep. No. 477, 53d Cong., 2d Sess., p. 238; Rec., 53d Cong., 2d Sess., p. 6143.

"Under the Constitution the Senate of the United States has the power to try impeachments; to judge of the elections, returns, and qualifications of its own members; to determine the rules of its proceedings, punish its members for disorderly behavior, and, with the concurrence of two-thirds, expel a member; and it necessarily possesses the inherent power of self-protection.

"According to preamble and resolutions the integrity and purity of the members of the Senate had been questioned in a manner calculated to destroy public confidence in the body; and in such respects as might subject members to censure or expulsion. The Senate, by the action taken, signifying its judgment that it was called upon to vin-

dicate itself from aspersion and to deal with such of its members as might have been guilty of misbehavior and brought reproach upon it, obviously had jurisdiction of the subject matter of the inquiry it directed and power to compel the attendance of witnesses, and to require them to answer any question pertinent thereto. And the pursuit of such inquiry by the questions propounded in this instance was not, in our judgment, in violation of the security against unreasonable searches and seizures protected by the Fourth Amendment.

"In Kilbourn v. Thompson, 103 U. S., 168 (26:386), among other important rulings, it was held that there existed no general power in Congress, or in either House, to make inquiry into the private affairs of a citizen; that neither House could on the allegation that an insolvent debtor of the United States was interested in a private business partnership, investigate the affairs of that partnership, as a mere matter of private concern; and that consequently there was no authority in either House to compel a witness to testify on the subject. The case at bar is wholly different. Specific charges publicly made against senators had been brought to the attention of the Senate, and the Senate had determined that investigation was necessary. The subject matter as affecting the Senate was within the jurisdiction of the Senate. The questions were not intrusions into the affairs of the citizen; they did not seek to ascertain any facts as to the conduct, methods, extent, or details of the business of the firm in question, but only whether that firm, confessedly engaged in buying and selling stocks, and the particular stock named, was employed by any senator to buy or sell for him any of that stock, whose market price might be affected by the Senate's action. We can not regard these questions as amounting to an unreasonable search into the private affairs of the witness simply because he may have been in some degree connected with the alleged transactions, and as investigations of this sort are within the power of either of the two Houses they can not be defeated on purely sentimental grounds.

"The questions were undoubtedly pertinent to the subject matter of the inquiry. The resolution directed the committee to inquire 'whether any senator has been, or is, speculating in what are known as sugar stocks during the consideration of the tariff bill now before the Senate.' What the Senate might or might not do upon the facts when ascertained, we can not say, nor are we called upon to inquire whether such ventures might be defensible, as contended in argument, but it is plain that negative answers would have cleared that body of what the Senate regarded as offensive imputations, while affirmative answers might have led to further action on the part of the Senate within its constitutional powers.

"Nor will it do to hold that the Senate had no jurisdiction to pursue the particular inquiry because the preamble and resolutions did not specify the proceedings were taken for the purpose of censure or expulsion, if certain facts were disclosed by the investigation. The

matter was within the range of the constitutional powers of the Senate. The resolutions adequately indicated that the transactions referred to were deemed by the Senate reprehensible and deserving ₀of condemnation and punishment. The right to expel extends to all cases where the offense is such as in the judgment of the Senate is inconsistent with the trust and duty of a member. 1 Story, Const., sec. 838. Reference is there made to the case of William Blount, who was expelled from the Senate in July, 1797, for a 'high misdemeanor entirely inconsistent with his public trust and duty as a senator.' The offense charged against him, said Mr. Justice Story, was an attempt to seduce an American agent among the Indians from his duty, and to alienate the affections and confidence of the Indians from the public authorities of the United States, and a negotiation for services in behalf of the British government among the Indians. It was not a statutable offense nor was it committed in his official character, nor was it committed during the session of Congress, nor at the seat of government.

"Commenting on this case, Mr. Sergeant says, in his work on Constitutional Law, 2d ed., p. 302: 'In the resolution the Senate declared him guilty of a high misdemeanor, though no presentment or indictment had been found against him, and no prosecution at law was ever commenced upon the case. And it seems no law existed to authorize such prosecution.'

"The two Houses of Congress have several times acted upon this rule of law, and the cases may be found, together with debates on the general subject, in both Houses, of great value, in Smith's Digest of Decisions and Precedents, Senate Doc. No. 278, 53d Cong., 2d Sess. The reasons for maintaining the right inviolate are eloquently presented in the report of the committee in the case of John Smith, accused in 1807 of participating in the imputed treason of Aaron Burr, 1 Hall, Am. L. J., 459; Smith Dig., p. 23.

"We can not assume on this record that the action of the Senate was without a legitimate object, and so encroach upon the province of that body. Indeed, we think it affirmatively appears that the Senate was acting within its right, and it was certainly not necessary that the resolutions should declare in advance what the Senate meditated doing when the investigation was concluded.

"Doubtless certain general principles announced in Runkle v. United States, 122 U. S., 543 (30:1170), cited by petitioner's counsel as conclusive, were correctly set forth, but that case has not been approved in subsequent decisions on the same subject, and the presumptions in favor of official action have been held to preclude collateral attack on the sentences of courts-martial, though courts of special and limited jurisdiction. United States v. Fletcher, 148 U. S., 84 (37:378); Swaim v. United States, 165 U. S., 553 (ante, 823).

"Counsel contend with great ability that the law under consideration is necessarily subject to being impaled on one or the other of

two horns of a dilemma, either inflicting a fatal wound. The one alternative is that the law delegates to the District of Columbia Criminal Court the exclusive jurisdiction and power to punish as contempt the acts denounced, and thus deprives the Houses of Congress of their constitutional functions in the particular class of cases. The other alternative is that if the law should be interpreted as leaving in the Houses the power to punish such acts, and vesting in addition jurisdiction in the District Criminal Court to punish the same acts as misdemeanors, then the law is invalid because subjecting recalcitrant witnesses to be twice put in jeopardy for the same offense contrary to the Fifth Amendment.

"The refusal to answer pertinent questions in a matter of inquiry within the jurisdiction of the Senate, of course, constitutes a contempt of that body, and by the statute this is also made an offense against the United States.

"The history of congressional investigations demonstrates the difficulties under which the two Houses have labored, respectfully, in compelling unwilling witnesses to disclose facts deemed essential to taking definitive action, and we quite agree with Chief Justice Alvey, delivering the opinion of the Court of Appeals, 'that Congress possessed the constitutional power to enact a statute to enforce the attendance of witnesses and to compel them to make disclosure of evidence to enable the respective bodies to discharge their legitimate functions;' and that it was to effect this that the Act of 1857 was passed. It was an Act necessary and proper for carrying into execution the powers vested in Congress and in each House thereof. We grant that Congress could not devest itself, or either of its Houses, of the essential and inherent power to punish for contempt, in cases to which the power of either House properly extended; but, because Congress, by the Act of 1857, sought to aid each of the Houses in the discharge of its constitutional functions, it does not follow that any delegation of the power in each to punish for contempt was involved; and the statute is not open to objection on that account.

"Nevertheless, although the power to punish for contempt still remains in each House, we must decline to decide that this law is invalid because it provides that contumacy in a witness called to testify in a matter properly under consideration by either House, and deliberately refusing to answer questions pertinent thereto, shall be a misdemeanor against the United States, who are interested that the authority of neither of their departments, nor of any branch thereof, shall be defied and set at naught. It is improbable that in any case cumulative penalties would be imposed, whether by way of punishment merely, or of eliciting the answers desired, but it is quite clear that the contumacious witness is not subjected to jeopardy twice for the same offense, since the same act may be an offense against one jurisdiction and also an offense against another; and indictable statutory offenses may be punished as such, while the offenders may

likewise be subjected to punishment for the same acts as contempts, the two being diverso intuitu and capable of standing together. General Houston's case, 2 Ops. Atty. Gen., 655 (Attorney-General Butler); Rex v. Lord Ossulston, 2 Strange, 1107; Cross v. North Carolina, 132 U. S., 131 (33:287); Re Debs, 158 U. S., 564 (39:1092); State v. Woodfin, 5 Ired. L., 199 (42 Am. Dec., 161); Yates v. Lansing, 9 Johns., 395 (6 Am. Dec., 290); State v. Williams, 2 Speers, L., 26; Foster v. Com., 8 Watts & S., 77.

"In our opinion the law is not open to constitutional objection, and the record does not exhibit a case in which, on any ground, it can be held that the Supreme Court of the District, sitting as a Criminal Court, had no jurisdiction to render judgment."

In the fourth ground relator assails the good faith of the Senate in appointing the committee. With that phase of the question we do not deem it the province of the court to discuss. So long as the legislative branch of the government acts within the scope of the authority vested in it, its good or bad faith in the passage of laws or resolutions is no more a matter to be submitted to our judgment than would the good faith of the court in rendering a decision in this case be a proper subject for legislative criticism. As to the motives, object and purposes of the Senate in passing this resolution and in the appointment of this committee, we have no right to inquire if they had the legal right to appoint a committee to gather information to enable them, as they assert, to correct evils they claim existent in present laws on any subject. Should a committee thus appointed seek to go beyond the scope of authority conferred by the resolution creating it, or should they seek to require a citizen of this State to answer questions in regard to matters they had no right to inquire into, or elicit information on subjects not embraced within their power to regulate by legislation, this court could and would protect the citizen in all the rights guaranteed to him under the Constitution of this State.

The third ground has been the question that has been the cause of much study, of grave thought and anxious solicitude to arrive at a correct judgment. Article 3, section 15, provides: "Each House may punish by imprisonment, during its session, any person not a member, for disrespectful or disorderly conduct in its presence, or for obstructing any of its proceedings." That relator has been guilty of disrespectful or disorderly conduct in the presence of either House during its session none assert, but it is insisted by respondent that by refusing to answer the questions propounded to him by its committee, relator has been guilty of "obstructing the proceedings" of the Senate, and as one of the main cases relied on by the respondent to sustain this contention is the case of In re Chapman, 166 U. S., 661, we have heretofore copied pretty fully from that opinion, for in it it is held that the Senate alone had the power to appoint a committee to investigate a matter within the powers conferred on it and to

gather information to enable them to act intelligently in matters· upon which they were authorized to deal, even though the purpose of the inquiry was not disclosed by the resolution. Respondent also insists that it as clearly announces that a failure to answer a proper inquiry would be a contempt of the Senate, and the Senate would have the right to punish for such contempt. To this we do not entirely agree. In the opinion it is not claimed that the Constitution of the United States gave to the Senate this power to punish for such contempt, but only that in a proper case where the Senate would under its inherent power be authorized to punish, this would not render unconstitutional and void a statute which authorized the punishment as a misdemeanor by the courts of the country for failure to answer proper questions.

Mr. Cooley in his work on Constitutional Limitations, page 193, says that it has been held that a refusal to appear or to testify before a legislative committee would be a contempt of the House, and on page 191 he says: "Each House may also punish contempts of its authority by other persons, where they are committed in its presence, or where they tend directly to embarrass or obstruct its legislative proceedings; and it requires for the purpose no express provision of the Constitution conferring the authority. It is not very well settled what are the limits to this power," but that power was sustained in the case of Anderson v. Dunn, 6 Wheat., 204. Since the rendition of this opinion the doctrine laid down has been questioned and rejected as to some of its reasoning in the case of Kilbourn v. Thompson, 103 U. S., 168. And he adds: "But in America the authority of legislative bodies in this regard is much less extensive than in England, and we are in danger, perhaps, of being misled by English precedents. The Parliament, before its separation into two bodies, was a high court of judicature, possessed of the general power, incident to such a court, of punishing contempts, and after the separation the power remained with each body, because each was considered to be a court of judicature and exercised the functions of such a court. American legislative bodies have not been clothed with the judicial function, and they do not therefore possess the general power to punish for contempt; but, as incidental to their legislative authority, they have the power to punish as contempts those acts of members or others which tend to obstruct the performance of legislative duty, or to defeat, impede, or embarrass the exercise of legislative power." And then cites us to the case of Kilbourn v. Thompson, 103 U. S., 168. In this case Kilbourn had refused to answer certain questions propounded to him by a committee appointed by Congress, and had been adjudged guilty of contempt, and sentenced to imprisonment, and the right of Congress to so punish, or either branch thereof, in the premises is discussed. It is said in this case:

"The argument before us has assumed a very wide range, and includes the discussion of almost every suggestion that can well be

conceived on the subject. The two extremes of the controversy are: the proposition on the part of the plaintiff, that the House of Representatives has no power whatever to punish for a contempt of its authority; and on the part of defendants, that such power undoubtedly exists, and when that body has formally exercised it, it must be presumed that it was rightfully exercised.

"This latter proposition assumes the form of expression sometimes used with reference to courts of justice of general jurisdiction; that having the power to punish for contempts, the judgment of the House that a person is guilty of such contempt is conclusive everywhere.

"Conceding for the sake of the argument that there are cases in which one of the two bodies, that make together the Congress of the United States, may punish for contempt of its authority, or disregard of its orders, it will scarcely be contended by the most ardent advocate of their power in that respect that it is unlimited.

"The power of Congress itself, when acting through the concurrence of both branches, is a power dependent solely on the Constitution. Such powers are not found in that instrument, either by express grant or by fair implication from what is granted, are 'reserved to the States respectively, or to the people.' Of course, neither branch of Congress, when acting separately, can lawfully exercise more power than is conferred by the Constitution on the whole body, except in the few instances where authority is conferred on either House separately, as in the case of impeachments. No general power of inflicting punishment by the Congress of the United States is found in that instrument. It contains in the provision that no 'person shall be deprived of life, liberty or property, without due process of law,' the strongest implication against punishment by order of the legislative body. It has been repeatedly decided by this court and by others of the highest authority, that this means a trial in which the right of the party shall be decided by a tribunal appointed by law, which tribunal is to be governed by rules of law previously established. An Act of Congress which proposed to adjudge a man guilty of a crime and inflict the punishment, would be conceded by all thinking men to be unauthorized by anything in the Constitution. That instrument, however, is not wholly silent as to the authority of the separate branches of Congress to inflict punishment. It authorizes each House to punish its own members. The 3d clause of the 15th section of the first article declares that 'each House may determine the rules of its proceedings, punish its members for disorderly behavior and, with the concurrence of two-thirds, expel a member.' And in the clause just preceding it is said that they 'may be authorized to compel the attendance of absent members, in such manner and under such penalties as each House may provide.' These provisions are equally instructive in what they authorize and in what they do not authorize. There is no express power in that instrument conferred on either House of Congress to punish for contempts.

"The advocates of this power have, therefore, resorted to an implication of its existence founded on two principal arguments. These are: 1, its existence by the House of Commons of England, from which country we, it is said, have derived our system of parliamentary law; and, 2, the necessity of such a power to enable the two Houses of Congress to perform the duties and exercise the powers which the Constitution had conferred on them.

"That the power to punish for contempt has been exercised by the House of Commons in numerous instances is well known to the general student of history, and is authenticated by the rolls of the Parliament. And there is no question but that this has been upheld by the courts of Westminster Hall. Among the most notable of these latter cases are the judgments of the Court of King's Bench, in the case of Brass Crosby, Lord Mayor of London, 3 Wils., 188, decided in the year 1771; the case of Burdett v. Abbott, 14 East, 1, in 1811, in which the opinion was delivered by Lord Ellenborough, and in the case of Sheriff of Middlesex, in 11 Ad. & E., 273, in 1840. Opinion by Lord Denman, Chief Justice.

"It is important, however, to understand on what principle this power in the House of Commons rests, that we may see whether it is applicable to the two Houses of Congress and, if it be, whether there are limitations to its exercise.

"While there is, in the adjudged cases in the English courts, little agreement of opinion as to the extent of this power, and the liability of its exercise to be inquired into by the courts, there is no difference of opinion as to its origin. This goes back to the period when the bishops, the lords and the knights and burgesses met in one body, and were, when so assembled, called the High Court of Parliament.

"They were not only called so, but the assembled Parliament exercised the highest functions of a court of judicature, representing in that respect the judicial authority of the King in his Court of Parliament. While this body enacted laws, it also rendered judgments in matters of private right, which, when approved by the King, were recognized as valid. Upon the separation of the Lords and Commons into two separate bodies, holding their sessions in different chambers, and hence called the House of Lords and the House of Commons, the judicial function of reviewing by appeal the decisions of the courts of Westminster Hall passed to the House of Lords, where it has been exercised without dispute ever since. To the Commons was left the power of impeachment and, perhaps, others of a judicial character, and jointly they exercised, until a very recent period, the power of passing bills of attainder for treason and other high crimes which are in their nature punishment for crime declared judicially by the High Court of Parliament of the Kingdom of England.

"It is upon this idea that the two Houses of Parliament were each courts of judicature originally, which, though devested by usage, and

by statute, probably, of many of their judicial functions, have yet retained so much of that power as enables them, like any other court, to punish for a contempt of these privileges and authority, that the power rests.

"In the case of Burdett v. Abbott, already referred to as sustaining this power in the Commons, Mr. Justice Bailey said, in support of the judgment of the Court of King's Bench: 'In an early authority upon that subject, in Lord Coke, 4 Inst., 23, it is expressly laid down that the House of Commons has not only a legislative character and authority, but is also a court of judicature; and there are instances put there in which the power of committing to prison for contempts has been exercised by the House of Commons, and this, too, in cases of libel. If, then (said he), the House be a court of judicature, it must, as is in a degree admitted by plaintiff's counsel, have the power of supporting its own dignity as essential to itself; and without power of commitment for contempts it could not support its dignity.' In the opinion of Lord Ellenborough in the same case, after stating that the separation of the two Houses of Parliament seems to have taken place as early as the 49th of Henry III, about the time of the battle of Evesham, he says the separation was probably effected by a formal Act for that purpose by the King and Parliament. He then adds: 'The privileges which have since been enjoyed, and the functions which have been uniformly exercised by each branch of the Legislature, with the knowledge and acquiescence of the other House and of the King, must be presumed to be privileges and functions which then, that is, at the very period of separation, were statutably assigned to each.' He then asks: 'Can the High Court of Parliament, or either of the two Houses of which it consists, be deemed not to possess intrinsically that authority of punishing summarily for contempts, which is acknowledged to belong, and is daily exercised as belonging to every Superior Court of law, of less dignity undoubtedly than itself?' This power is here distinctly placed on the ground of the judicial character of Parliament, which is compared in that respect with the other courts of superior jurisdiction and is said to be of a dignity higher than they.

"In the earlier case of Crosby, Lord Mayor of London, De Gray, Chief Justice, speaking of the House of Commons, which had committed the Lord Mayor to the Tower of London for having arrested by judicial process one of its messengers, says: 'Such an assembly must certainly have such authority, and it is legal because necessary. Lord Cone says they have a judicial power; each member has a judicial seat in the House; he speaks of matters of judicature of the House of Commons.' Mr. Justice Blackstone, in concurring in the judgment said: 'The House of Commons is a Supreme Court, and they are judges of their own privileges and contempts, more especially with reference to their own members.' Mr. Justice Gould also laid stress upon the fact that the 'House of Commons may be properly

called judges,' and cites 4 Coke's Inst., 47, to show that an alien can not be elected to Parliament because such a person can hold no place of judicature.'

"In the celebrated case of Stockdale v. Hansard, 9 Ad. & Ell., 1, decided in 1838, this doctrine of the omnipotence of the House of Commons in the assertion of its privileges received its first serious check in a court of law. The House of Commons had ordered the printing and publishing of a report of one of its committees, which was done by Hansard, the official printer of the body. This report contained matter on which Stockdale sued Hansard for libel. Hansard pleaded the privilege of the House, under whose orders he acted, and the question on demurrer was: assuming the matter published to be libelous in its character, did the order of the House protect the publication?

"Sir John Campbell, Attorney-General, in an exhaustive argument in defense of the prerogative of the House, bases it upon two principal propositions, namely, that the House of Commons is a court of judicature, possession the same right to punish for contempt that other courts have, and that its powers and privileges rest upon the lex parliamenti, the laws and customs of Parliament. These, he says, and cites authorities to show it, are unknown to the judges and lawyers of the common law courts, and rest exclusively in the knowledge and memory of the members of the two Houses. He argues, therefore, that their judgments and orders on matters pertaining to these privileges are conclusive, and can not be disputed or reviewed by the ordinary courts of judicature.

"Lord Denman, in a masterly opinion, concurred in by the other judges of the King's Bench, ridicules the idea of the existence of a body of laws and customs of Parliament unknown and unknowable to anybody else but the members of the two Houses, and holds with an incontrovertible logic that when the rights of the citizen are at stake in a court of justice, it must, if these privileges are set up to his prejudice, examine for itself into the nature and character of those laws, and decide upon their extent and effect upon the rights of the parties before the court. While admitting, as he does in the subsequent case of Sheriff of Middlesex (supra), that when a person is committed by the House of Commons for a contempt in regard to a matter of which that House had jurisdiction, no other court can relieve the party from the punishment which it may lawfully inflict, he holds that the question of the jurisdiction of the House is always open to the inquiry of the courts in a case where that question is properly presented.

"But perhaps the most satisfactory discussion of this subject, as applicable to the proposition that the two Houses of Congress are invested with the same power of punishing for contempt, and with the same peculiar privileges, and the same power of enforcing them, which belonged by ancient usage to the House of the English Parlia-

ment, is to be found in some recent decisions of the Privy Council. That body is by its constitution vested with authority to hear and decide appeals from the courts of the Provinces and Colonies of the kingdom.

"The leading case is that of Kielley v. Carson, and others, 4 Moore (P. C.), 63, decided in 1841. There were present at the hearing Lord Chancellor Lyndhurst, Lord Brougham, Lord Denman, Lord Abinger, Lord Cottenham, Lord Campbell, Vice-Chancellor Shadwell, the Chief Justice of the Common Pleas, Mr. Justice Erskine, Dr. Lushington, and Mr. Baron Parke, who delivered the opinion, which seems to have received the concurrence of all the eminent judges named.

"Measuring the weight of its authority by the reputation of the judges who sat in the case and agreed to the opinion, it would be difficult to find one more entitled on that score to be received as conclusive on the points which it decided.

"The case was an appeal from the Supreme Court of Judicature of Newfoundland. John Kent, one of the members of the House of Assembly of that island, reported to that body that Kielley, the appellant, had been guilty of a contempt of the privileges of the House in using towards him reproaches, in gross and threatening language, for observations made by Kent in the House, adding, 'Your privilege shall not protect you.' Kielley was brought before the House and added to his offense by boisterous and violent language, and was finally committed to jail under an order of the House and the warrant of the Speaker. The appellant sued Carson, the Speaker, Kent, and other members, and Walsh, the messenger, who pleaded the facts above stated and relied on the authority of the House as sufficient protection. The judgment of the court of Newfoundland was for the defendants, holding the plea good.

"This judgment was supported in argument before the Privy Council on the ground that the Legislative Assembly of Newfoundland had the same parliamentary rights and privileges which belonged by usage to the Parliament of England, and that, if this were not so, it was a necessary incident to every body exercising legislative functions to punish for contempt of its authority. The case was twice argued in the Privy Council, on which its previous judgment in the case of Beaumont v. Barrett, 1 Moore (P. C.), 59, was much urged, in which both those propositions had been asserted in the opinion of Baron Parke. Referring to that case as authority for the proposition that the power to punish for a contempt was incident to every legislative body, the opinion of Baron Parke in the later case uses this language: 'There is no decision of a court of justice, nor other authority, in favor of the right, except that of the case of Beaumont v. Barrett, decided by the judicial committee, the members being Lord Brougham, Mr. Justice Bosanquet, Mr. Justice Erskine, and myself. Their lordships do not consider that case as one by which

they ought to be bound in deciding the present question. The opinion of their lordships, delivered by myself, immediately after the argument was closed, though it clearly expressed that the power was incidental to every legislative assembly, was not the only ground on which that judgment rested, and, therefore, was, in some degree, extrajudicial; but beside this, it was stated to be founded entirely on the dictum of Lord Ellenborough in Burdett v. Abbott, which dictum, we all think, can not be taken as authority for the abstract proposition that every legislative body has the power of committing for contempt. The observation was made by his lordship with reference to the peculiar powers of Parliament, and ought not, we all think, to be extended any further. We all, therefore, think that the opinion expressed by myself in Beaumont v. Barrett, ought not to affect our decision in the present case, and, there being no other authority on the subject, we decide accordingly to the principle of the common law, that the House of Assembly have not the power contended for. They are a local Legislature, with every power reasonably necessary for the exercise of their functions and duties, but they have not what they erroneously supposed themselves to possess—the same exclusive privileges which the law of England has annexed to the House of Parliament.' In another part of the opinion the subject is thus disposed of: 'It is said, however, that this power belongs to the House of Commons of England; and this, it is contended, affords us authority for holding that it belongs, as a legal incident by the common law, to an assembly with analogous functions. But the reason why the House of Commons has this power is not because it is a representative body with legislative functions, but by virtue of ancient usage and prescription; the lex et consuetudo parliamenti, which forms a part of the common law of the land, and according to which the High Court of Parliament before its division, and the House of Lords and Commons since, are invested with many privileges, that of punishment for contempt being one.' The opinion also discusses at length the necessity of this power in a legislative body for its protection, and to enable it to discharge its law-making functions, and decides against the proposition. But the case before us does not require us to go so far, as we have cited it to show that the powers and privileges of the House of Commons of England, on the subject of punishment for contempts, rest on principles which have no application to other legislative bodies, and certainly can have none to the House of Representatives of the United States, a body which is in no sense a court; which exercises no functions derived from its once having been a part of the highest court of the realm and whose functions, so far as they partake in any degree of that character, are limited to punishing its own members and determining their election. The case, however, which we have just been considering, was followed in the same body by Fenton v. Hampton, 11 Moore (P. C.), 347, and Doyle v. Falconer, L. R. 1 P. C., 328, in

both of which, on appeals from other Provinces of the Kingdom, the doctrine of the case of Kielley v. Carson, is fully reaffirmed.

"We are of opinion that the right of the House of Representatives to punish the citizen for a contempt of its authority or breach of its privileges, can derive no support from the precedents and practices of the two Houses of the English Parliament nor the adjudged cases in which the English courts have upheld these practices. Nor can it be said that, taking what has fallen from the English judges, and especially the later cases on which we have just commented, that much aid is given to the doctrine that this power exists, as one necessary to enable either House of Congress to exercise successfully their function of legislation.

"This latter proposition is one which we do not propose to decide in the present case, because we are able to decide it without passing upon the existence or nonexistence of such a power in aid of the legislative function.

"As we have already said, the Constitution expressly empowers each House to punish its own members for disorderly behavior. We see no reason to doubt that this punishment may in a proper case be imprisonment, and that it may be for refusal to obey some rule on that subject made by the House for the preservation of order.

"So, also, the penalty which each House is authorized to inflict in order to compel the attendance of absent members may be imprisonment, and this may be for a violation of some order or standing rule on that subject.

"Each House is by the Constitution made the judge of the election and qualification of its members. In deciding on these it has an undoubted right to examine witnesses and inspect papers, subject to the usual rights of witnesses in such cases; and it may be that a witness would be subject to like punishment at the hands of the body engaged in trying a contested election, for refusing to testify, that he would if the case were pending before a court of judicature.

"The House of Representatives has the sole right to impeach officers of the government, and the Senate to try them. Where the question of such impeachment is before either body acting in its appropriate sphere on that subject, we see no reason to doubt the right to compel the attendance of witnesses and their answer to proper questions, in the same manner and by the use of the same means, that courts of justice can in like cases.

"Whether the power of punishment in either House by fine or imprisonment goes beyond this or not, we are sure that no person can be punished for contumacy as a witness before either House, unless his testimony is required in a matter into which that House has jurisdiction to inquire, and we feel equally sure that neither of these bodies possess the general power of making inquiry into the private affairs of the citizen.

"It is believed to be one of the chief merits of the American system of written constitutional law, that all the powers entrusted to governments, whether State or National, are divided into the three grand departments of the executive, the legislative, and the judicial. That the functions appropriate to each of these branches of government shall be vested in a separate body of public servants, and that the perfection of the system requires that the lines which separate and divide these departments shall be broadly and clearly defined. It is also essential to the successful working of this system, that the persons entrusted with power in any one of these branches shall not be permitted to encroach upon the powers confided to the others, but that each shall by the law of its creation be limited to the exercise of the powers appropriate to its own department and no other. . . .

"The case of Anderson v. Dunn, was decided before the case of Stockdale v. Hansard, and the more recent cases in the Privy Council to which we have referred. It was decided as a case of the first impression in this court, and undoubtedly under pressure of the strong rulings of the English courts, in favor of the privileges of the two Houses of Parliament. Such is not the doctrine, however, of the English courts today. In the case of Stockdale v. Hansard, 9 Ad. & El., 1, Lord Denman says: 'The House (of Commons) is not a court of law at all in the sense in which that term can alone be properly applied here. Neither originally nor by appeal can it decide a matter in litigation between two parties; it has no means of doing so; it claims no such power; power of inquiry and accusation it has, but it decides nothing judicially, except when it is itself a party, in cases of contempt. . . . Considered merely as resolutions or acts, I have yet to learn that this court is to be restrained by the dignity or the power of any body, however exalted, from fearlessly, though respectfully, examining their reasonableness and justice, when the rights of third persons in litigation before us depend upon it.' Again he says: 'Let me suppose, by way of illustration, an extreme case: the House of Commons resolves that anyone wearing a dress of a particular manufacture is guilty of a breach of privilege, and orders the arrest of such persons by the constable of the parish. An arrest is made and action brought, to which the order of the House is pleaded as a justification. In such a case the plaintiff's counsel would insist on the distinction between privilege and power, and no lawyer can seriously doubt that it exists; but the argument confounds them and forbids us to inquire into any particular case, whether it ranges under the one or the other. I can find no principle which sustains this.'

"The case of Kielley v. Carson, in 4 Moore (P. C.), 63, from which we have before quoted so largely, held that the order of the assembly, finding the plaintiff guilty of a contempt, was no defense to the action for imprisonment. And it is to be observed that the case of Anderson v. Dunn, was cited there in argument.

"But we have found no better expression of the true principle on this subject than the language of Mr. Justice Hoar, in the Supreme Court of Massachusetts, reported in 14 Gray, 226, in the case of Burnham v. Morrissey. That was a case in which the plaintiff was imprisoned under an order of the House of Representatives of the Massachusetts Legislature for refusing to answer certain questions as a witness, and to produce certain books and papers. The opinion, or statement rather, was concurred in by all the court, including the venerable Chief Justice Shaw:

" 'The House of Representatives (says the court) is not the final judge of its own power and privileges in cases in which the rights and liberties of the subject are concerned, but the legality of its action may be examined and determined by this court. That House is not the Legislature, but only a part of it, and is therefore subject in its action to the laws in common with all other bodies, officers and tribunals within the Commonwealth. Especially is it competent and proper for this court to consider whether its proceedings are in conformity with the Constitution and laws, because living under a written Constitution, no branch or department of the government is supreme, and it is the province and duty of the judicial department to determine in cases regularly brought before them, whether the powers of any branch of the government, and even those of the Legislature in the enactment of laws, have been exercised in conformity to the Constitution; and if they have not, to treat their acts as null and void. The House of Representatives has the power under the Constitution to imprison for contempt, and the power is limited to the cases expressly provided for by the Constitution, or to cases where the power is necessarily implied from these constitutional functions and to the proper performance of which it is essential.'

"In this statement of the law, and in the principles there laid down, we fully concur."

Relator and respondent cite a number of authorities, but we do not deem it necessary to discuss each one of them, but have copied extensively from the Chapman case, which presents clearly the contention of respondent, and the Kilbourn case, which presents the contention of relator, and under the holding in the cases, and the other cases, we are of the opinion that neither a Legislature, nor either branch thereof, has any inherent power, under a Constitution like the one in force in this State, to punish one by imprisonment for contempt. One who is only partially familiar with the history of the English speaking people, would recognize that our legislative bodies are not clothed with similar powers as possessed by the English Parliament. In the development of a government in England, all power at one time was supposed to be vested in the King, and whatsoever he declared became and was the law of the land, and he alone construed and enforced the law through such instrumentalities as he saw proper to employ. Even the right of the people to have a parliament or

legislative body was of slow growth, and was accomplished in the end by patriotic men at different periods wrenching this power by degrees from the Sovereign King. The establishment of the courts, their power and jurisdiction, free from the domination of the King, was likewise of slow growth, and was accomplished by men on the battlefield, yielding up their lives and shedding their blood that a government might be founded, in which one man alone would not be supreme arbiter of their lives, their weal or their woe, both as regards their person and their property. In the development of Parliament, the King at times but used it as an instrument to further his will, and instead of being a body representative of the citizenship of the land, it was used as a body by which again might be usurped the powers wrung from the King on the battlefield, and was also used as a body to punish men who had the courage to oppose the usurpation by the King of the rights granted at Runnymede and on other battlefields, and at other periods. Parliament at one time could only sit at the will of the King, and there were periods when it met very irregularly, and at times years would pass when there would be no session. In the course of time Parliament, in a measure, became freed from the domination of the King, and its growth and power has developed gradually until now, in many matters, its will is superior to that of the Sovereign. The development of the power of the courts was also gradual, but in the course of time the judiciary in that country has also become freed from a domination by the King, but at the time of the Declaration of Independence by the Colonies in 1776, the powers and jurisdiction of Parliament, and the powers and jurisdiction of the courts, were not so well defined in England even as they are today. The fact that the English Parliament at one time would constitute itself a court to try men for offenses against the law of the land, and under its judgments inflict even the death penalty, is no argument that the Congress of the United States, or the Legislature of any State in this Union have that power, or could usurp that right. At the time of the framing of the Constitution of the United States, Congress was granted certain powers; a judicial system was established and granted certain jurisdiction, and the duties of the ruler or executive officer, whom we termed president, were clearly defined. In fact, we founded a new system of government, and while the common law was made the rule of decision in all the courts, yet the laws of England in so far as they were antagonistic to our form of government, became no part of our system. When the Colonies had gained their independence, in framing a Constitution they provided for three separate and distinct powers of government: Legislative, Executive and Judicial.

Article 1. All legislative powers herein granted shall be vested in a Congress of the United States, which shall consist in a Senate and House of Representatives. Article 2. The executive power shall be vested in a president of the United States of America. Article 3.

The judicial power of the United States shall be vested in one Supreme Court, and in such inferior courts as the Congress may from time to time ordain and establish.

Sovereignty, which had theretofore been lodged in the King, was reserved by the citizenship who had bared their breasts and shed their blood that a Republican government might be here found. When this Constitution was submitted to the people for ratification, they were not satisfied with the safeguards therein contained, and before its final ratification and adoption, amendments thereto were required to be adopted. Knowing that in the mother country contest between catholicism and protestantism had been the cause of much friction, and at times war; that lives had been forfeited to the zeal of men who desired a creed established by law, it was provided that Congress shall make no law respecting an establishing of religion or prohibiting the free exercise thereof. That when the people had formerly assembled and petitioned the King for redress of wrongs, that those engaged had become marked men, and their lives became forfeited on slight or no provocation, it was provided "the right of the people to peaceably assembly and to petition the government for a redress of grievances" shall be inviolate, and no law should be passed in regard thereto, and it was also provided that no law should be passed abridging the freedom of speech, or of the press. Among many other things required to be added by amendment was, that no warrant should issue, but upon probable cause, supported by oath or affirmation, particularly describing the persons or things to be seized; that a person shall not be put twice in jeopardy for the same offense, nor be deprived of life or liberty without due process of law, and in all criminal prosecutions the accused shall be tried by an impartial jury in the State or district wherein the crime shall have been committed; to be informed of the nature of the accusation against him; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses, and to have the assistance of counsel for his defense. These were rights among others that neither the legislative, executive nor judicial department of government should have the right to take away from the citizenship of the different States of the Union. The people and their forefathers, having suffered from tyranny, were determined that neither the department to which they had confided the legislative power, nor the department to which they had confided the judicial power, nor the department to which they had confided the executive power, should have the authority or right to imprison any citizen except upon a written accusation informing him of the accusation against him; he should have a fair trial, and have the assistance of counsel. Yet, in some of the decisions holding that the Legislature has the right to imprison for contempt, it is held that the accused has not the right to be represented by counsel, and this right has been refused. It is well enough to look back to the landmarks occasionally before drifting too far away, and while this by some may

be said not to be a criminal prosecution, yet the Congress of the United States has so defined it and made it punishable as such, and under the decree entered he would be deprived of his liberty for a short period of time, and the stigma and disgrace of having occupied a cell in prison would thereafter attach to his good name. The length of time one must serve is not all that is to be considered—one who has before borne an irreproachable character, may by an hour's confinement in jail have it forever blasted, and the children who are to come after him suffer because thereof.

When Texas threw off the Mexican yoke, it also adopted a Constitution, in which sovereignty was reserved to the people, and this supreme power in government provided in the first article "that the powers of government shall be divided into three departments, viz.: legislative, executive, and judicial (and added), which shall forever remain separate and distinct." The Legislature is but the representative of this sovereign people, and in performing their legislative duties and they are supreme in their department, except in so far as they are inhibited from legislating in that instrument. The executive is but the representative of sovereignty in his department, while the judicial is likewise but the representative of sovereignty in its department, and each is likewise supreme in the department confided to it, except in so far as that instrument says "thou shalt not" either in express words or by necessary implication, and in this instrument, in section 16, of article 1, the power to punish by imprisonment was given to the Legislature and to each House thereof any person, not a member, who should be guilty of any disrespect to the House by disorderly conduct, during its sessions. Under it no right was given to punish for obstructing its proceedings. In the Constitution of 1876, the wording of this provision was so changed as to include the power to punish also "any person obstructing any of its proceedings."

In this Constitution of 1876 the first article contains what is termed the bill of rights, and which rights were excepted out of the general powers of government—neither of the three departments of government having the right to alter, amend or abridge those rights. Article 2 provides "that the powers of government shall be divided into three distinct departments, each of which shall be confided to a separate body of magistracy, to wit: Those which are legislative to one, those which are executive to another, and those which are judicial to another; and no person or collection of persons, being of one of these departments, shall exercise any power properly attached to either of the others, except in the instances herein expressly permitted."

The power to punish for contempt being a judicial power, requiring a judicial ascertainment of fact by a tribunal, and the adjudgment of punishment, the legislative department has no inherent power, as it is called, to exercise this judicial power, for this power is conferred upon the judicial department by this provision of the Constitution, unless in the Constitution is found some provision which expressly

permits the legislative department to exercise it. In exercising judicial powers the legislative department must look to the Constitution for permission so to do, and if it is not found therein, it is prohibited from exercising that power, for in that instrument it is declared that "no person, or collection of persons, being of one of these departments, shall exercise any power properly attached to either of the others, except in the instances herein permitted."

So we must look alone to section 15 of article 3, to judge if permission is given the legislative department of the government to exercise this judicial power in cases of this character. That this permission is given the legislative department under this section of article 3 of the Constitution, during its sessions, to punish as for contempt for disrespectful or disorderly conduct in its presence, or for obstructing its proceedings, is plain, and the only question to be determined is, what is meant by the words "obstructing its proceedings?" as used in our Constitution. Section 12 of article 3 provides: "Each House shall keep a journal of its proceedings, and publish the same; and the yeas and nays of the members of either House on any question shall at the desire of any three members present be entered in the journal."

Respondent insists that these words embrace not only the proceedings of each House as a whole when in session, but also embraces any matter that may take place before any standing committee of either house, or special committee appointed by either House to conduct an investigation or attend to any other matter wherein they would be authorized. But is this the construction that the Legislature itself has heretofore placed on these words? Has it ever published in its journal as a part of its "proceedings" the proceedings, if you so term it, of the various special committees heretofore appointed by our Legislature at its different sessions? It has always been held that a construction placed by a department of government, of long standing, will and should have strong persuasive force in determining the construction of given words used in regard to that department. We think that it has been almost an unbroken rule of construction by both Houses, that the proceedings had before a special committee was not a part of their proceedings, and have never been published in the journal, except in those instances where specifically authorized by a resolution passed to that effect, and in this instance the committee did not report its proceedings or recommendations to this session of the Senate, but was authorized to file its recommendations, and the evidence taken by it with the Secretary of State at a date subsequent to the adjournment of the Legislature, thus conclusively showing that the Senate did not construe the recommendations and the evidence taken as a part of the "proceedings" of that session of the Senate, for if it was a part of the proceedings of that session of the Legislature, then at the adjournment of the Legislature, which was fixed by the Constitution, all power to act as a Senate ceased, and the rec-

ommendations written by the committee at a date subsequent to the adjournment of the Legislature can by no construction be taken as a part of the proceedings of the last special session. While, as we are informed by the record, on or about October 1, the Senate Committee filed its recommendations with the Secretary of State, also a copy of the evidence, yet the House Committee had not filed any report at the time of the submission of this case, although the Legislature adjourned the latter part of last August. It will not do to say that the word "proceedings" has one meaning in section 12, and another meaning in section 15 of the same article of the Constitution. Investigating committees have been appointed to sit in vacation and go from place to place and hold sessions while the Constitution provides that the Legislature shall meet at such places as is provided by law, and the law of this State provides that its sessions shall be held at the seat of government except in the instances named in the law.

It is earnestly insisted that this construction will paralyze one department of the government—the legislative department—and that it is useless to hold that they have the right to appoint committees and seek and obtain information to enable them to legislate intelligently, and yet deny to them the right to enforce such right by punishing those who prove recalcitrant and defy their authority. We do not think this the result of such holding, but if it were, and it is so written in the Constitution, we are powerless to prevent it, for that instrument is the supreme law of the land, and not only limits the jurisdiction and power of the legislative department, but it also limits the power, authority and jurisdiction of the judicial department as well. The writer of this opinion has, and always will, uphold the legislative department in the exercise of all power conferred on it by the Constitution, and recognizes and fully appreciates that the judicial department has no right nor power to interfere with that department in the passage of laws or in the exercise of its other powers, nor as to its wisdom as to the provisions contained in such laws or other proceedings wherein it acts within the scope of the power confided in it by the Constitution, but we can not uphold that or any other department of government in the exercise of any power not confided to it, but specifically confided to another department of government, especially so when the Constitution in article 2 specifically prohibits it from exercising such power. But, as hereinbefore stated, we do not think that denying to the legislative department the power to punish for contempt in this character of proceedings, will be hurtful or harmful, nor prevent it from obtaining the necessary information. It can pass laws making it a penal offense, as the Congress of the United States has done.

If we had held that it had the power, it would be limited, as the Constitution prohibits it from inflicting more severe punishment than forty-eight hours imprisonment, and this penalty is entirely adequate

to secure, in our opinion, the results desired, that is, that all citizens be compelled to furnish all information to the legislative department which will enable it to legislate in all matters wherein they are authorized to pass laws for the best interests of the State and its citizens. A wilful refusal to furnish information, which the legislative department is authorized to demand, should be punishable by so severe a penalty as none would dare to refuse to comply, and the Legislature has the authority and power to enact such law, and in our opinion should do so. It is true that in a contest between a citizen and the Legislature as to whether or not the information sought related to a matter which the Legislature had a right to demand information, and whether it related to a matter which would be helpful and beneficial to that department in the enactment of laws, or redress of grievances, would, under such a law, be passed on by a different tribunal, and as to the wisdom of having a separate, distinct and impartial tribunal to pass on these contests between the citizen and the Legislature is for the best, we are not prepared to justify nor do we condemn. We believe though it will result in the Legislature securing all the information it is entitled to receive, and at the same time protect the citizen from being compelled to disclose, at the behest of anyone, his private affairs, or affairs about which the government has no right to inquire into or legislate on, and certainly can not and will not result in any injury to the State, and will amply protect the individual.

The Kilbourne case hereinbefore cited, amply illustrates that the legislative department at times may overstep its bounds, and punish individuals for refusing to furnish information which it had no right to demand, and while the legislative department did not suffer by reason of this case of mistaken judgment, yet Kilbourne was sent to a felon's cell, and the sergeant-at-arms who confined him therein was made to suffer. It seems to us, that if courts are to be permitted to pass on the question of whether or not the legislative department is seeking information beyond the scope of its authority, the courts should do so before any punishment is inflicted either on the person denying the right of the legislative department to such information, and also before the person, acting under the orders of the legislative department, has by carrying into effect its decrees, by his conduct rendered himself liable to punishment in the form of a suit for damages, or otherwise.

In the matters in which it is clear that the Constitution has conferred the power to imprison for contempt, no such results can follow, but in those cases where a contention arises as to whether the Legislature is seeking to invade the rights reserved to the citizen in the Bill of Rights and the Constitution between the Legislature and a citizen, a tribunal to arbitrate and judge the matter, which should, and in our opinion always will, protect both the rights of the citizen and yet secure to the legislative department all information to which

it is entitled, and enforce all power confided to it, may be best; at least we are of opinion our Constitution has so provided.

We do not wish to be understood as holding that in no case is the Legislature authorized to punish for contempt. In a number of cases judicial power is confided in that branch of government, all of which are enumerated in the Constitution, but in all cases wherein it is not so confided by the Constitution, it is prohibited by article 2 from exercising such power. As hereinbefore stated, that our legislative department has all power possessed by the English Parliament, as stated by some courts, can not be maintained under the Constitution of this State. The powers of the English government by no law, decree of the King, Parliament, or any other body authorized to speak for the English people, has ever been divided into three separate and distinct departments, with the limitation that no one of the departments should exercise the power attached to the other department. The scope of authority of the English Parliament had never, at the time of our independence, been defined by law or custom, so far as our information goes, while the scope of authority of our legislative bodies are defined by written Constitutions, which provisions are binding on all alike. If we confer on a department a power possessed by a department of the English government, or enact a law in force in England prior to our independence, we may and should look to the construction given that power or law in England that we may arrive at what the intention was in adopting such provisions, and our laws so provide. The English Parliament was at one time the Supreme Court of England, and exercised the privilege and right to annul the judgments and decrees of its courts, and to sit as a trial court where men were charged with crime, and affix the punishment, even to taking life. This power certainly was never and is not now possessed by our legislative bodies. In framing our organic law the fathers of this Republic intended to and did place around human life and human liberty many safeguards theretofore not possessed by them as English subjects, and, too, provided that before the citizen could be deprived of either his liberty or his property, it must be by due process of the law of the land, and in accordance with its provisions, and no department of government could arbitrarily take either from him or exercise jurisdiction not given it. If in so doing, the sovereign people took from any department of government powers and jurisdiction over matters which experience has shown it would have been best should not have been done, neither the legislative department, the judicial nor the executive department, can change that provision. There is but one to whom the appeal can be made, and that is the sovereign people—they and they alone can change the organic law.

Holding as we do that under our Constitution and form of government the legislative department has no inherent power to punish for contempt, but it derives its power so to do from the Constitution

alone in instances in which it can exercise that power, and also hold-
ing that the facts in this case do not bring relator within the provi-
sions of section 15 of article 3 of the Constitution, relator is dis-
charged.

                                        *Relator discharged.*

  DAVIDSON, Presiding Judge (dissenting)—I concur in results.
For reasons for my conclusion, see Ex parte Wolters, this day decided.
  PRENDERGAST, Judge.—I refer to my opinion in the Wolters
case for my views in this case. I do not concur, but dissent to the
disposition made of this case.

                          ON REHEARING.

                        February 28, 1912.

  HARPER, Judge.—On a former day of this term the relator was
ordered discharged, a majority of the court holding that the Legisla-
ture was without jurisdiction to adjudge relator guilty of contempt.
The State, through the attorneys representing the Legislature, has
filed a motion for rehearing herein, as well as in the case of Ex parte
Wolters, in which the same judgment was entered. Relator has filed
a motion to dismiss the motion for rehearing, which is fully stated
in the opinion of Presiding Judge Davidson in the Wolters case, and
we do not deem it necessary to restate it here. A large part of Judge
Davidson's opinion is devoted to discussing whether relator was guilty
of a civil or criminal contempt, if the Legislature had jurisdiction to
adjudge him guilty of contempt. It may be conceded that in drawing
the distinction between civil and criminal contempts, that the great
weight of authority draws this distinction: A civil contempt consists
in failing to do something which the contemnor is required to do by
order of the court for the benefit or advantage of a party to the pro-
ceeding; while a criminal contempt is all these acts of disrespect to
the court or its process—in fact, all cases in which the State alone
is interested in the enforcement of the order. In this case the ques-
tions propounded were intended to aid the Legislature in securing
information to enact, annul or repeal laws, and it may be said that
the State was the party at interest, and it comes within the class of
adjudged criminal contempts.

  But it does not necessarily follow that a criminal contempt is a
criminal case within the meaning of our Constitution and laws re-
lating to criminal cases and offenses. No article of the Penal Code
makes either civil or criminal contempt an offense, and article 3 of the
Penal Code provides: "In order that the system of penal law in force
in this State may be complete within itself, it is declared that no
person shall be punished for any act or omission unless the same is
made a penal offense and a penalty is affixed thereto by the written
law of this land." So, if a person guilty of criminal contempt is

*guilty of a criminal offense* within the meaning of our Constitution and laws, it not having been made an offense by the Penal Code of this State, no person can be punished for being guilty of what is designated as criminal contempt. Again, our Code provides that no person shall be prosecuted for a criminal offense except upon indictment found in case of felony, or upon presentation of information in case of misdemeanor, and by complaint in justice court. A person who is guilty of *criminal contempt in the presence of the court* may be punished without the presentation of either complaint, information or indictment. Contempt, in this State, is *not a crime,* because it has not so been made by the penal law. In the case of United States v. Lee Huen, 118 Fed., 442, it is said: "A criminal proceeding is the manner in which the government punishes a man guilty of crime," and in the case of Post v. United States, 161 U. S., 583, it is held criminal proceedings can not be said to be brought until a formal charge is made against the accused either by indictment, or information, or by complaint before a magistrate.' In the case of Re Schulz's Lessee v. Moore (Ohio) Wright, 280, it is said: "A criminal case is a public prosecution for a crime or misdemeanor." In Mitchell v. State, 11 N. W., 848, it is held: "A criminal crime is one where the proceedings against the defendant is by indictment," etc. This question has heretofore been before our own courts, and in the case of Taylor v. Goodrich, 40 S. W. Rep., 515, it is held: "A 'criminal case' is defined to be an action, suit or cause instituted to secure a conviction and punishment for crime, or to punish an infraction of the criminal law." In that case it is held that a contempt proceeding is not a criminal case within the meaning of our Constitution and laws. For a full discussion of this question we refer to this case, where will be found cited many authorities. Many other cases could be cited, but the opinions in these cases have already become so lengthy we feel that we should be brief, referring, however, to the Canfield case copied in the original opinion.

But we take it, that if it was a criminal case, this court would not be debarred from entertaining a motion for rehearing. This is not a trial court, but a court of review. It is an appellate court, and we do not adjudge a person guilty or innocent of crime. No judgment we could enter would debar the State from prosecuting a man on a charge of violating the laws of this State. A person arrested for violating the criminal laws of the State may sue out a writ of habeas corpus, alleging that the process is invalid because of some defect, or that the facts do not authorize his detention, and this court may so decree and discharge him, yet if additional facts are discovered, the decree of this court would not prevent an indictment and prosecution for the offense. The matters, as heard by us, are not a *trial of the case,* but a review of some character of proceedings. While our laws provide that where a man has been tried and acquitted, the State has no right of appeal, yet no law provides that where

a person is tried and convicted, that the State can not file motions to correct judgments, bring up correct transcripts, or any other motion that may be filed by the defendant applicable to the case. In the case of Carusales v. State, 47 Texas Crim. Rep., 1, 82 S. W. Rep., 1038, this court held that the rules governing the Court of Civil Appeals, adopted by the Supreme Court, were applicable to this court under the rules adopted by the Supreme Court, and the Constitution of this State gives to the Supreme Court the right to adopt rules governing all courts. These rules authorize either party to file a motion for rehearing within fifteen days from the rendition of the judgment, and there is no law or rule of the court which prohibits the State from filing a motion for rehearing in this court within the time prescribed by law. It has been the rule in this court to permit the State to file motions for rehearing since its organization, and prior to that in the Supreme Court, when it had jurisdiction in criminal cases, and we see no sound reason for changing this rule at this late day. It is the rule of law that is said to be fundamental, that a court has jurisdiction over its judgments until the end of the term to alter, amend or set them aside, unless the judgment has in part been performed. There is not, nor can there be, any such plea entered in this case. We are, therefore, of the opinion that the motion for rehearing should be entertained, and the motion to strike it from the record overruled.

As hereinbefore stated, the opinions in these cases are of such length we would deem it inexcusable to write at length on any matter involved herein, unless our opinion in the cases had been changed by the motion herein filed by able counsel. While not again writing on the propositions involved, we have carefully considered all the grounds stated in the motion for rehearing and reviewed the authorities cited, but being of the opinion as announced in the original hearing, we are of opinion the motion for rehearing should be overruled.

The motion for rehearing is overruled.

*Overruled.*

DAVIDSON, PRESIDING JUDGE.—For some of my reasons for believing the State's motion for rehearing should not be entertained see Ex parte Wolters, this day disposed of.

I am clearly of opinion that there is no merit in the motion for rehearing, and inasmuch as my brethren entertain jurisdiction to hear and determine the motion, I agree with Judge Harper in overruling it.

PRENDERGAST, JUDGE.—I fully concur in Judge Harper's opinion that this court has the right and power, and that it is its duty, to entertain a motion by the State for rehearing in a habeas corpus proceeding, notwithstanding on the original hearing this court dis-

charged relator. That such a proceeding is not a criminal *case* under our law, and that the statutes and Constitution prohibiting a new trial in a *criminal case* have no application, I have no doubt.

However, I believe a rehearing should be granted, the former judgment set aside, and relator remanded to custody in accordance with my opinion in the Wolters case.